Kressly v. Oceania Cruises. Good morning, Your Honors. You may proceed. I please the Court. My name is Mike Winkleman. I represent the plaintiff, the appellant, Gabriele Kressly, who is a 78-year-old woman who went on a cruise. The captain decided he was going to drive the ship into a hurricane, basically a really bad storm, and she ends up getting catapulted across the room. I know you all know that. I'll get right to the heart of the matter. There's really two legal questions and then some factual questions. The legal question is one of what is the proper degree of care that should be applied in a situation like this. And what's important to note is that because Oceania is a cruise ship, they are treated as what are called common carriers, just like airplanes, just like buses, like taxis, like trains. And as common carriers, and this stems from Supreme Court precedent, they have heightened obligations under the law. What's your best case that says that? City of Panama, Judge. It's from 1879, and it's still good law. It was not overruled by Kermarack, but if you look at that City of Panama case, which is cited in my briefs . . . Because all the cases I've looked at, including the Supreme Court of the United States, Camerick, for example, and others say the standard is a reasonable standard of care. And I want to be very clear, because this is such an important point. You're 100% correct, Judge, in what I'm advocating for and what . . . You want a heightened standard in this case. Correct. But I want you to understand, I'm not saying Kermarack needs to be overruled. I'm not saying it's not . . . You can't overrule Kermarack. Good point. I'm not saying it should change, thank you. What I'm saying is that it's consistent with Kermarack, that it's reasonable care under the circumstances, but when it's a unique maritime peril, that it is a heightened degree of care. And that's exactly what City of Panama said back in 1879. And just to quote something that's in the brief, passengers must take the risk incident to the mode of travel which they select, but those risks in the legal sense are only such that the utmost care, skill, and caution of the carrier in the preparation and management of the means are unable to avert. In other words, that's the Supreme Court saying, fleshing out this a little bit, that the duty should really be of reasonable care is the utmost care, skill, and caution of the carrier. And even the next paragraph in City of Panama talks about the public policy concerns regarding common carriers and says that they should be held to the greatest possible care and diligence. Under the facts of this case, has any circuit applied a heightened standard of care? Well, yes. In which circuit, in which case? Sure. There was first, there was the Ramey case, Judge, which was from the Second Circuit, which was out of a 1959 case. And that's an important case because it squarely says, in several cases down the road follow Ramey. And what Ramey basically says is, we've stated on a number of occasions that an ocean carrier must exercise a very high degree of care for the safety of its passengers. And this is where I think it's key. It says, we hold that the Kramer Act rule of reasonable care under the circumstances is applicable in passenger cases. We agreed on that. This is where it's... Well, it sounds like they apply the reasonableness of care under Kramer Act. But here's the nuance, Judge. This is what's important. The extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passenger will determine how high a degree of care is reasonable in each case. In other words, the way we refer to it is, if it's a unique maritime peril and there's more of a danger to the passenger... What makes this case unique? It's what makes it a unique maritime peril. In other words, is this a danger you would face on land? Are you a danger of a ship going through high waves and you being thrown across the room on land? Of course not, Judge. This is the classic unique maritime peril where this is a cruise ship where a captain has knowingly decided to go through a really bad storm with extremely high waves and... I've already turned the ship around and actually tried to avoid this storm and in fact, I think even your expert witness testified, I guess, in deposition and opposition to the motion for summary judgment that while he might have taken a different route than what the captain took in this case, he couldn't fault the captain for the route he took. Isn't that basically what he testified? Not at all, Judge. He did not testify. He was not deposed. He merely had a report that was submitted and the report... What did he say in the report? He basically said that he chose the wrong route, that he should have gone further up, higher up, so he could have avoided it. And most critically, what he said was that, basically, that he was going too fast. Well, not really. Okay. Your expert said that he should have been going less than nine knots, right? Correct. He said in these conditions, he should have been slower than what the vessel was going. Okay. And he also... The problem I have with the... At the end of the expert's report, there are all these conclusions about how negligent the captain was, but the only thing I could really attach it to was the nine knots thing, because despite these conclusions, the report seems to think that Captain Hansen had a report that predicted a certain level of wind and a higher level of wind actually happened. So is there something else specific besides your expert's statement that he should have been going less than nine knots? Yes. Okay. What else is there? He slowed down immediately after the accident. Within 30 minutes of the incident, he slowed down the vessel further. That's it? No, no. Not only that. Okay. What do you got? He should have been going nine knots. He slid... Right. He slowed down after the accident. All right. Right. A couple hours later, he actually ends up entirely diverting the course, so he no longer contends the call to Charleston, and instead, he goes to Jacksonville. So that, in and of itself, shows that this was not a navigable route that he chose. It wasn't a good route, depending on, you know, it wasn't a great route, given what happened, that the storm was bigger than he thought. But what says that the captain's plan, when he diverted, when he started, was a bad idea, or when he chose a certain diversion, was a bad idea, given what they knew, not forecasts aren't dependable? What is it that says the captain made a bad choice, under this expert's view, when he left and when he diverted only a certain way? Sure. Well, first of all, I think what you're asking is ultimately a question which should be decided by a jury. I don't think... Yeah, we can put it to jury, as long as you've got an expert who will testify to that, and we need to see what the evidence is that he would say. Sure. What he basically talks about in his report, and that's submitted, is that basically he would have chosen a different path. He would have chosen a different path. That would have lessened the conditions, but I think the most important one, in his conclusions, number four, Judge... Okay, these are conclusions. In this report, there has to be something that backs up those conclusions, and we talked about, well, he should have been going less than nine knots when this thing... He snowed down, and he entirely rerouted after it. So I want to know, what makes him negligent before he knows how bad this storm is? Opinion number one, the regatta's master drove his vessel into the heart of a storm because he didn't get a weather forecast for the passage his ship was making before departing Hamilton, Bermuda. Okay, so... Number two... No, no. Those are the conclusions, right? No, that's the opinions, Judge. That's ten? Are you on... I'm on page... Ten? I'm on page eight, under opinions. All right. Yeah. Page... Oh, you're on page eight. This is I don't understand. He didn't get a weather forecast. Well, he did have a weather forecast, but you're saying it was for the wrong place? No. The expert had an issue with whether or not the forecasts were accurate or not. To me, I don't think your decision should turn on that, but you're asking what his opinions were. He lays out ten different opinions. I'm happy to read through all of them, but let's just go with number ten. Oceania failed to use reasonable care on the regatta during this voyage because... These were the conclusions that I was trying to relate to the earlier facts that he recounts. Did not know the weather maps he had were not weather forecasts. I couldn't find that explained. Okay. So forget about that one. In the next one, too, there's an issue with calculating time. This is under ten, the bullet points. Here. Did not have... Ten. He did not know how to forecast the weather himself. Well, I don't know that you're required to forecast the weather yourselves, and can't a captain get a forecast from somewhere else? I agree with you. I think start at number four, and I think you're starting to answer your bullet four. Okay. Number four. Did not have the knowledge or experience to take the normal and safe passage up towards Charleston. Okay. That has to be based on some fact. That's based on his opinion, and even the next one. Did not have the knowledge or experience to stay out of the way of the Gulf Stream as much as possible. In other words, he was fighting against a heavy current. The next bullet, he drove the regatta into the heart of a storm. These are the conclusions that I was trying to relate to things in the earlier part. These are the... In the earlier part of his report, and like I said, I got the nine knots that he was going too fast. Why not that fact in and of itself? It might be. Okay. But I was looking to see whether there was something else. Anyway. Frankly, I agree. The way this report is written, it's confusing. But even setting aside the report, Judge, you have the testimony of the captain where he says, I saw that the weather forecast were 40... The actual weather conditions were 45% worse than it was actually forecasted. So he knew it was really bad. And is that where he decides to take a different route? Nope. Nope. All he does is change a little bit, but he still says he's going to go to Charleston. He changes his route somewhat. He doesn't change his route until Gabrielle Cressley is severely injured and his ship is damaged. Okay. He doesn't change the port he's going to. Correct. Correct. Okay. Correct. So number one, the captain testified that he knew the weather conditions were dramatically worse than what were forecasted, and he still went full speed ahead. Not only that, we have the emails in the record where he talks about he's emailing the shoreside captain and telling him the weather conditions are a lot worse. So he knows he's endangered. And remember, the district court's judge, his opinion was predicated that they weren't on notice of the severity of the condition. That's what this was predicated on. And number one, there's case law from this district that says you don't need notice when you're dealing with a unique maritime peril. And number two, the captain knew precisely how dangerous it was. And if it's a question of, well, was this reasonable or was this not reasonable, this wasn't a bench trial. This wasn't a jury trial. This was summary judgment. And if you... The question is, was your stuff on summary judgment good enough? Yes. That's my position. The answer is yes. I see that I'm way over my time, so I'll reserve more. That's all right. You were answering the court's questions, and you can have your full rebuttal. But we will hear now from Oceana. So, Mr. Winkleman, you've reserved full seven still. Good morning, and may it please the court. Jack Ryder and Jordan Cautious on behalf of Oceana Cruises. I'll start, Your Honors, by discussing the standard of care. Judge Dubina, as Your Honor correctly points out, there is an unambiguous and unbroken line of authority, starting with the United States Supreme Court in Cummerack, and that has continued through multiple circuits, including this one, that the standard of care is not heightened, but the standard of care is what is reasonable under the circumstances. What about that Supreme Court case he cites that apparently is still good law? Your Honor, but the case that he cites, the Phelps decision, it doesn't dictate what is the standard owed with respect to what is the duty within the context of reasonableness. In Cummerack, the court, the United States Supreme Court, said it is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care, reasonable care, to those who are lawfully aboard the vessel. Now, courts that have examined, well, what does it mean when we talk about reasonable care, have consistently maintained the principle that you don't change the standard, you just simply evaluate the facts and compare them to the standard that's been utilized by the Supreme Court and the circuits since the Supreme Court's decision. So it may be the case that when one evaluates whether or not the conduct under the circumstances was appropriate, then you measure that conduct under the reasonableness standard. You don't change the standard. You change the examination weighed against the standard. And I would submit that that is an appropriate approach because the whole concept of reasonableness and what makes the reasonableness standard appropriate is its inherent malleability and the fact that it can be applied across the board. Has any circuit or the Supreme Court ever applied a heightened standard of care under facts similar to the facts we have in this case? No, Your Honor, no. They have not. There is no notion of a heightened standard of care. What courts have evaluated was whether or not there's a specific instance or event for which a higher degree of care was reasonable, but not was a higher degree or a higher standard required. That's the key here, was a higher degree of care reasonable. I mean, that's the standard here. In light of the severe weather and everything else that was going on, normally you aren't giving announcements about weather. And so they were doing things above and beyond what they normally did because of the weather. That is absolutely right, Your Honor. So the question is, in light of the circumstances, did they exercise reasonable care? Yes, Your Honor, I agree with that. And to answer to be more precise, I will point out factually that the weather was reported on a daily basis. The weather was given as a matter of course. But Your Honor is absolutely correct. Yeah, but normally they're saying the weather is bright and sunny and blah, blah, blah. Exactly. Here they're giving it and saying it's bad. Did the captain get a forecast before he left port? Yes, he did, Your Honor. The evidence is undisputed. Did he get a forecast going out for the number of days that he would be out there? Yes, Your Honor. The evidence from Captain Hansen is undisputed, that he meets with his bridge team, that they evaluate using four different methodologies of weather forecasting. He identifies them, the BVS, the Bon Voyage system. What day did they leave? I'm sorry, Your Honor? What day did they leave? They set sail October 31st, I believe, is when they left Bermuda. And they had evaluated the weather, they had forecasted the weather, and Captain Hansen's testimony on this is undisputed. And Judge Rustani, as you pointed out, their expert throws out a lot of conclusions about what his perspective, his perception was, but they don't have any facts, Your Honors, to identify. He does say that a more prudent course would have been to do this. That doesn't say that was negligent. Until the end, he says it was negligent, that he would have had a more prudent course. The one clear fact I saw was this, because of the conditions, he should have been going less than nine knots. That's the only factual argument or point the expert makes, but that is not, Your Honor, I would submit a fact. That's the expert's opinion. That's the expert's opinion about what he deemed to be. He can give an opinion. At least, I mean, that's all you got, negligent or negligent. But he doesn't have any disputed facts. At least it's specific as opposed to conclusory. I was looking for other specific things in this report. I don't think you'll find any, Your Honor. I know. And I would, going back to Judge Hall's point about whether or not the conduct and the standards were met here, did the conduct here fulfill the appropriate standard of care? I would submit absolutely. I want to highlight a couple of significant points here. First of all, contrary to counsel's comment about that there was no slowing down of the vessel until after the accident, that's incorrect as a matter of fact. On the contrary, Captain Hansen testified, and there's even an e-mail, which I'll discuss in a moment. But Captain Hansen testified that as soon as he encountered the storm and realized that the weather was going far worse than it had been predicted by the four different methodologies that he had utilized, he reduced the comfort speed, which he testified as 7 to 8 knots per hour. So, Your Honor, to the extent that the expert was suggesting that he should have gone even lower, Captain Hansen testified, corroborated by the logbooks, which are prepared on the vessel contemporaneously with the voyage of the vessel, Captain Hansen testified that the ship was reduced to comfort speed, and he said that that happened, and this was before the accident. And that's on the record. What is comfort speed? You said 7 to 9? 7 to 8 knots per hour was Captain Hansen's testimony, undisputed and corroborated by the logbooks with respect to the fact that he reduced the speed very quickly after the regatta encountered the inclement weather. Furthermore, Does the logbook show that the speed was reduced before the words of plaintiff flew across the room? Absolutely, Your Honor. Where's that? Where's it in the record? That's at the record, page 31-1, pages 25, 47, and 51, where Captain Hansen was deposed and examined the logbooks as he was testifying. The accident was at 6.10, I think. And what time was the reduction in speed? There were multiple reductions, Your Honor. I'm talking about the comfort speed one. The comfort speed would have been, I believe, at approximately 5.11 p.m., shortly after the announcement was made. And, in fact, we have the e-mail, which was an exhibit to Captain Hansen's deposition, in the record, page 31-12, and it's an exhibit 6 to Captain Hansen's deposition. It was an e-mail November 1st at 5.11 p.m., and it's written to Luigi Rossetto, which is Captain Hansen's supervisor, and he says, Good day, Luigi. We are experiencing very high winds, between 50 and 60 knots from west, so I decided to deviate a bit more south for best comfort and safety for everyone. The wind force is more stronger than forecasted. Now, that goes right to the heart of the point that counsel made, which was, I believe, inaccurate, that Captain Hansen didn't deviate the course in order to try and avoid the impact of the storm until after the accident. That's inaccurate. The accident, the unfortunate accident, obviously we feel sympathy for Mrs. Cressley, but there's no negligence here. The unfortunate accident happened after 6 p.m. at 5.11. This e-mail demonstrates that there was a reduction. The e-mail doesn't reference the reduction, but the logbooks do, but the e-mail does reference the fact that Captain Hansen had started to deviate his trajectory further south to try and avoid the storm. I understand that two warnings were given. Can you tell us at what time those warnings were given and who gave those warnings to all of the passengers on the ship? Absolutely, Your Honor. The first warning, I want to specify the time. Take a look. Your Honor, the first warning was given relatively early in the day. I don't have the precise time in front of me, and I can pull it up. It will take me just a moment. But I don't have the precise time in front of me. However, the first warning was given very early in the afternoon. When I say early in the afternoon, the inclement weather started to become evident at 6 a.m. on November 1st. It was shortly after that, it might have even been around noontime, that the warning was provided. Again, talking about the specificity of the warning here. Did the captain give this warning? Well, first the captain, and then that was followed by the cruise director, Your Honor. The captain, in giving the warning, and of course this is in the brief, but was very clear and specific in his reference to the warning.  he said, quote, Exercise extreme caution when moving around the ship. Use handrails when on the stairways. Captain Hansen also, and by the way, he was reading from a document that's also in the record, the advice to the passengers for specific warning conditions. He said, He specifically stated that the best place to avoid ship movement is midship, deck four or deck five. And we have record sites for all of this, Your Honor. It's the record. These are pages 31-1 of his deposition at pages 23 and pages 135 and 37, where he talked about and specifically identified the warning that was given. And the document reflecting the warning was actually part of an exhibit to his depot. I actually don't think that this lady could have done anything. She was in her stateroom, and she has to go to the bathroom. I mean, she's got to move across. I mean, not saying that all the passengers were instructed to crawl. So I don't see what this lady could do. It seems to me that the big question here is, was the captain behaving in a reasonable way? And the warnings were given, but those kind of warnings can't save somebody who's in their stateroom and has to move across their stateroom. Well, Your Honor, I would respectfully disagree in this way. Tell me why. Well, first of all, I start from the perspective of the one would look at the circumstances here, and the question is, was the warning fair and adequate? Did the warning provide enough information to put a reasonable person on notice, to be aware of their surroundings, to protect themselves? I think it's significant here that there's no dispute that the warnings were given and that the warnings were given repeatedly, twice by the captain, once by the cruise director, and the Cressleys testified that they heard the warnings, they understood the warnings, they acknowledged the warnings. In fact, Mr. Cressley testified, we didn't need the warnings. Everyone knew what was going on. So with respect to you asked the question, well, what could she have done differently? And I would respectfully submit that the question isn't what Mrs. Cressley could have done differently. It's whether or not the captain could have done anything differently. Well, I think that is the key. The problem is that the warnings don't really do anything in this case. I mean, if the ship gets hit by a wave that's unexpected and she just at that particular moment is moving, you've got a problem, and she has to move. The problem is, was the captain negligent or not? And, Your Honor, you, I believe, hit the nail right on the head. Was it unexpected? And this is, I think, a very significant difference. This was not, Your Honor said it was an unexpected wave. There was nothing unexpected about this. It were in 12 hours of rough weather. That's the whole point. See, Mrs. Cressley and Mr. Cressley testified that this weather event had been happening for hours. They knew the ship was pitching and rolling. They knew that the waves were hitting against the ship. This was not an unexpected, and this is very significant, Your Honor, because the issue of whether or not the vessel even has a duty to warn, I would submit that one could argue we didn't even have a duty to warn, but we did. Now, the question is, was the ship put in a place it shouldn't have been put? I understand, Your Honor. And that's the issue. Now, I want to ask you about this expert's report. Yes, Your Honor. The expert says it would have been more prudent, and I'm not going to talk about whether that satisfies the standard or not, to go at a different place in the Gulf Stream, in a narrower section where the weather would have been better. And my question is, when did the captain know that the weather was bad enough that he needed to move to such a place? I understand, Your Honor. And the point here is that it's undisputed that he had no warning, and that at 6 a.m., when he observed the weather was growing worse, it is undisputed that it was not significantly worse than weather that the ship had already encountered across the leg of its journey. So this was not a circumstance where, and I think it's very significant, this is not a circumstance where the captain sailed into a hurricane. The captain utilized the best tools available to him to chart an appropriate weather course, and in doing so, unfortunately, came upon a storm, adjusted the speed, deployed the stabilizers. He reduced the comfort speed. He adjusted the stabilizers. He adjusted his routes to the south. And, by the way, I did confirm. He could have gone to a different port, right, if it was bad enough? He didn't have to keep heading towards Charleston. But he adjusted his route south to try and avoid the storm. They were in the middle of the Atlantic, Your Honor. I mean, it wasn't as if they had a port next door when the storm came upon them. How far are they offshore at the time of all this storm coming from Bermuda to Charleston? How far out are they? Based upon my recollection, they were roughly in the middle between the two points, several hundred miles. I know that, Your Honor, several hundred miles. I don't have a precise. Not between the two points, but I'm talking about off of the port. How far were they offshore, like somewhere in North Carolina? I just recall, Your Honor, it was at least 400 or 500 miles, but I don't believe there was any. Okay, so they were way out in the ocean. They were. There was no—I don't recall anything in the record on that point. I do want to point out I've confirmed that the first announcement, the first warning was, in fact, at noon. Another one was at 525 p.m., so I confirmed that. And that's from Captain Hansen's deposition at page 16 and at page—actually, both on page 16. He talked about the two warnings he gave. But I want to circle back to the point of, if I may, may I just— It seems like they should have added to the warning. I don't know if this is outcome determinative or not. If you're in your cabin, you need to not move without holding onto something or something like that. Do we have a picture of the cabin here? We do, Your Honor. It's in the record. I believe it was an attachment to one of the motions for summary judgment. And were the handrails—I'm just curious—that you could have gotten to the bathroom by holding onto stuff or did you have to cross the floor, if I look at the picture? There were things to grab onto. I don't know that there were handrails in the middle of the room. No, but like a chair. There were many things to hold onto. You could have gone from place to place holding onto something? Absolutely, and she testified that she did so because she was completely aware of the severity of the— Okay, so then it was the heave of the ship that even doing that, even her trying to do that, it caused her to fall. That's right. And, of course, just for the factual record, she wasn't utilizing the bathroom. She was getting up to retrieve a pen from a desk, and that's when, unfortunately, she fell. And finally, this case is exactly like the Miller decision, the Miller case out of this court, which this court affirmed very recently, where there was no specific warning given, and yet a person who was on a dance floor, suddenly the ship was hit by an unexpected violent wave, as it was described in the opinion, and the passenger was thrown to the floor. Another person also got injured, and in that case, the court found that because the danger posed on a ship is open and obvious, it was open and obvious to the sense that the ship moves, the vessel moves, and that was a circumstance where the ship was not in the throes of a storm. That was a circumstance where there was some movement of the vessel, and suddenly the person was described as having been thrown violently to the floor, and yet this court affirmed summary judgment because there's a certain degree of risk because any time one goes on— When you're dancing on a ship. Absolutely, Your Honor, or when the storm is raging and you're aware of it. And I would just say in conclusion, trains— Well, I mean, the ship could have stopped. I don't know. I've been thinking about this case a lot. They could have stopped, but then the waves are still going to be going. You can't stop the ocean, Your Honor, right? I don't know enough about it to know whether that's worse than— Exactly, Your Honor. What to do, I don't know. But I think you're over your time, and we understand the case, unless my colleagues have any further questions. I'm sorry, Mr. Wingleman. We would ask that the court affirm. Thank you. Just a couple points that I want to go over. I think first as to the warnings, I think both Your Honors have it correct that the warnings that they gave didn't do anything, and that's one of our arguments that the warnings were not sufficient. I think if you liken this— They didn't even have to give any warnings. I don't think there's a duty to warn per se, like per se, but I think when they're aware of a dangerous condition, they do have to give it. If you're referencing an open and obvious argument, I would say that's undercut by the fact that they gave the argument— excuse me, that they gave the warning. But the point that I'm making is, Judge Hull, you said, you know, how is she going to get to the bathroom? Is she going to crawl across the floor? I compared—thank you. I compared it to being on an airplane where they tell you to buckle up and to stay seated. Here, they didn't tell her to stay seated. They didn't tell her to buckle up. They don't have buckles on the ship, so it's a different thing. But—and not only that, but she was at the very front of the ship, the bow of the ship, judges, which is the most—admitted, undisputed, the most dangerous place on the ship. So she was entitled to a greater warning. I thought there was a warning that you should move if you have, you know— the middle of the ship, decks four and five, that's the safest place if you're, you know, concerned. The captain said he said that. Gabrielle Kressley and her husband never said that they heard that warning. And it would be different, too, from what—they have their stand-in written policy, which is you can move around. If you're going to take a shower, hold a handrail. That doesn't say stay seated. Does she say she was holding on as she moved in the cabin and still it was so bad, so she is holding on to things? Absolutely. She testified she got up and she was holding a chair and was reaching towards the desk where there was a warning. Right, right, right. She's catapulted in the air. And there's a violent movement. As her husband, who's now deceased, unfortunately, he said it was like a zero-gravity thing. And if you've ever been on a boat, they go up and down. This was extremely heavy pitching, so she was thrown up into the air. And, Judge Hull, you're 100% correct. There was nothing that she could have done. Okay, so that clarifies that. Then we get to really whether or not, at what point, the captain should have taken another route or done something. I mean, you're on a ship, a storm comes up, and it's really like, are you going to have strict liability for violent waves, or are you going to put it on the passenger if they're doing all they can? I don't know. I'm not asking for strict liability. I know, but that's, in effect, what it is. When there's a violent movement, everybody's doing what they can. The captain's trying to go another course. It would be different if he didn't do anything. Or if he had this full report of how heavy the storm was going to be before he left port, but he didn't have that report. There wasn't any report like that, was there? Agreed. He didn't do anything. The whole time, he was still planning to go to the transfer. What do you contend he should have done here, that you have expert testimony that says this is what he should have done? Because every negligence case is you have somebody say, no, reasonable care would have been to do blah, X, Y, Z. What do you claim he should have done? To focus it in, number one, he should have taken a different course. He should have taken a more prudent route, which I have expert testimony from Douglas Torberg. Where? I mean, he's out in the middle of the ocean. What course should he have taken? Does he say what course it should have been? Absolutely. He absolutely does. He basically says instead of taking a direct route, he should have gone up and around, basically more up towards North Carolina. And one of the reasons he said that was this captain was sailing right into the Gulf Stream, which is a very strong current that made it even harder for him. And Judge Rustani picked up on that, that he could have taken a more prudent course. That's number one. Number two, when he realized he was in this danger, he should have slowed down more. And this is critical stuff about when he slowed down, and I would encourage your honors to look at that. He said he slowed down in the logbook show. He slowed down at 5.11, reduced comfort speed to 7 to 8. Is that not correct? That's 100% correct, Judge, but that's not all the evidence. If you look at the deck log, your honors said the accident was at 6.10. The entry at 6.18, ship speed reduced for better comfort. The speed was reduced again. And what the evidence shows is that he went from about 6.10. But your expert just said he should have done less than 9. He didn't say what speed. And they have evidence they went to 7 to 8. Afterwards. That's what they did. No, 7 to 8 was at 5.11. No, that's incorrect, Judge. And even the experts says that at 4, he reduces it basically from 19 to about 9. And then there's two reductions in speed. One is, as Mr. Ryder just said, was at 5.11. That was the first reduction. And what was at 2? That was from 18 to 9. No, you just said 4 o'clock was 19 to 9. I apologize. The 5.11 was from 18 to 9. He just said it's from 7 to 8. And we look at the log. I think you have to look at the logs to see it. And if you look at what Mr. Torberg said. He reduced comfort speed to 7 to 8. I don't know what it came from at 5.11. That's not what the testimony shows. I'm not talking about the testimony shows. What does the log show? The log says that at 4.25, they gave the heavy weather announcement, speed reduced due to heavy pitching. From what to what? It doesn't say. Okay. Silent. Okay. Accident happens at 6.10. I know, but there was a reduction at 5.11. What is that from, according to you? Not from the deck log. I don't know where they're getting that from. Okay. Accident happens at 6.10. Speed is reduced again at 6.18. Okay, but there must be some other charts he's referring to. I don't know. No. Everything is in the deck log. But again, you have expert testimony, never challenged under Daubert. That says he was going too fast and he took the wrong course. But I thought he said, the expert said it should have been less than nine. What the expert said was it should have been less than nine. We're trying to see if we were less than nine at the time of the accident. Agreed. And I don't think you have anything definitively on point. What he says, at 4.25, and this is page seven, docket entry 31-6, page seven, at 17.25, 4.25, the master made the second heavy weather announcement. 17.21 is 5.25, isn't it? No, you're right, 5.25. Thank you, Judge. 17.25 is 5.25. You're right. He makes the second heavy weather announcement, and he reduces it from 18 to nine. And you have this speed would have been less. Well, he talks about to prevent heavy pitching, the ship should have proceeded at a speed where the ship's bow coming off one wave would slowly go into the trough. Okay, and you're now over. So I'm trying to pull people. And you saved seven for rebuttal. So we just have to look at the record for all the various logs. If I may just briefly summarize, Judge? Yes, go ahead. That this is an important case from a policy perspective because this is cruise ships, these are common carriers. Your decision will make a decision as to how safe everyone's cruise is into the future. For the jury. Thank you. I agree with that. It should be reversed and remanded, and this should be argued. That's a jury argument. Thank you very much. Thank you so much. Thank you, Judge.